UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DEREK CLINTON DENTON | ) | |
| 16253-076 | ) | |
| Atlanta USP | ) | |
| P.O. Box 150160 | ) | |
| Atlanta, GA 30315, | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 1:04-cv-03285-RLV-AJB |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| JOHN YOST | ) | |
| Assistant Warden | ) | |
| USP Atlanta | ) | |
| 601 McDonough Boulevard SE | ) | |
| Atlanta, GA 30315 | ) | |
| | ) | |
| RON WILEY | ) | |
| Warden | ) | |
| USP Atlanta | ) | |
| 601 McDonough Boulevard SE | ) | |
| Atlanta, GA 30315 | ) | |
| | ) | |
| IVAN L. NEGRON, MD | ) | |
| Physician | ) | |
| USP Health Services Atlanta | ) | |
| 601 McDonough Boulevard SE | ) | |
| Atlanta, GA 30315 | ) | |

VICTOR R. GONZALEZ, MD          )
Psychiatrist                    )
USP Health Services Atlanta     )
601 McDonough Boulevard SE      )
Atlanta, GA 30315               )
                                )
EFREN CARBONELL, MD             )
Physician                       )
USP Health Services Atlanta     )
601 McDonough Boulevard SE      )
Atlanta, GA 30315               )
                                )
JENELLE FOOTE, MD               )
Midtown Urology, P.C.           )
128 North Avenue, N.E.          )
Suite 1000                      )
Atlanta, GA 30308               )
                                )
MIDTOWN UROLOGY, P.C.           )
128 North Avenue, N.E.          )
Suite 1000                      )
Atlanta, GA 30308               )
                                )
COURTNEY D. SHELTON, MD         )
315 Boulevard NE                )
Suite 520                       )
Atlanta, GA 30312-1266          )
                                )
MATTHEW J. GOLDSTEIN, MD        )
303 Parkway Drive               )
Atlanta, GA 30312               )
                                )
D. ABERNATHY, MD                )
Atlanta Medical Center          )
303 Parkway Drive               )
Atlanta, GA 30312               )

| | |
|---|---|
| TENET HEALTHSYSTEM GB, | ) |
| INC. d/b/a/  ATLANTA MEDICAL | ) |
| CENTER | ) |
| 315 Boulevard NE, Suite 500 | ) |
| Atlanta, Georgia 30312 | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT
## FOR DAMAGES AND INJUNCTIVE RELIEF
### (Eighth Amendment: Deliberate Indifference to Serious Medical Need; Federal Tort Claims Act and Georgia Law: Medical Malpractice, Prison Negligence)

**Nature of the Case**

1.  Plaintiff, a federal prisoner, claims that (a) prison administrators, on the stated ground that plaintiff's condition was not life threatening, overruled a prison physician's order that plaintiff be taken to a hospital emergency room for treatment of priapism (abnormal, painful erection of the penis); (b) for over two weeks thereafter, despite repeated recurrence of plaintiff's priapism, prison physicians, deterred by the administrators, failed to take plaintiff to a hospital, failed to consult an urologist, failed to monitor plaintiff's condition, failed to advise plaintiff to seek immediate treatment of recurrence, and failed properly to treat plaintiff's priapism when he came to the prison clinic; (c) in light of plaintiff's known need for emergency treatment by an urologist, the behavior of the prison administrators and physicians constituted not only negligence, but deliberate indifference to plaintiff's

serious medical need, or intentional deprivation of needed medical treatment; and (d) their behavior caused plaintiff to suffer grievous injury, including permanent total erectile dysfunction (impotence).

2.  Plaintiff claims that after prison staff finally took plaintiff to a hospital, negligent delay by the hospital physicians caused some additional tissue damage. Plaintiff claims that by the time prison staff took him to the hospital it was too late to prevent plaintiff from suffering permanent total erectile dysfunction; but he also claims, alternatively, that if delay by the hospital staff increased the degree of his permanent erectile dysfunction, the hospital and its staff are liable either for the increased injury they caused or, alternatively, for all of plaintiffs' injury, jointly with the prison defendants, if responsibility cannot be apportioned.

3.  Plaintiff claims that (a) about a month before his first episode of priapism, a prison psychiatrist increased from 50 mg to 150 mg plaintiff's daily dosage of Doxepin, a psychotropic medication for depression; (b) the psychiatrist failed to advise plaintiff to seek immediate treatment if he experienced priapism; the psychiatrist previously had failed to so advise plaintiff when the psychiatrist had treated plaintiff with Trazodone; (c) the failure to advise plaintiff was negligent because the psychiatrist knew or should have known that Trazodone was associated with occurrence of priapism and that the high dosage of Doxepin and

plaintiff's known sickle cell trait created an elevated risk of priapism; and (d) the failure to advise plaintiff, which continued after priapism occurred, caused plaintiff to suffer lengthy episodes of priapism, including his first, before seeking treatment, resulting in total permanent erectile dysfunction.  Plaintiff claims that the prison medical staff also negligently failed to discontinue plaintiff's Doxepin after priapism occurred.

4.  Plaintiff claims defendant United States is liable to plaintiff for compensatory damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq*., if any of the negligent prison administrators or doctors was an employee of the United States acting within the scope of his employment.

5.  Plaintiff claims defendant United States is liable under the Eighth Amendment for injunctive relief requiring defendant to assess plaintiff for penile implant surgery, to provide this surgery if appropriate, and to provide any other appropriate assessment or treatment of plaintiff's erectile dysfunction.  Plaintiff also seeks injunctive relief precluding defendant's prison administrators from overruling physicians' orders for assessment or treatment of plaintiff's medical conditions.

**Jurisdiction**

6.  This Court has jurisdiction under 28 U.S.C. § 1331 over plaintiff's constitutional claims for (a) money damages against the prison administrators and physicians sued in their personal capacities under the Eighth Amendment for deliberate indifference to serious medical need or intentional deprivation of medical care and (b) injunctive relief against defendant United States.  This Court has jurisdiction under 28 U.S.C. § 1367 over all of plaintiff's other claims; these claims are so related to the constitutional claims that they form part of the same case or controversy under Article III of the United States Constitution, and no § 1367(c) reason for declining jurisdiction over them applies.

7.  In addition, this Court has jurisdiction under 28 U.S.C. § 1332 over plaintiff's damages claims against each defendant other than the United States, because (a) the matter in controversy as to each of these claims exceeds the sum or value of $75,000, exclusive of interest and costs; and (b) plaintiff is a citizen of the State of Tennessee and each of these defendants is a citizen of a different State or States.

8.  This Court has jurisdiction under 28 U.S.C. § 1346(b) over plaintiff's FTCA damages claim against defendant United States.  On November 2, 2004, the federal Bureau of Prisons (BOP) received an administrative claim from plaintiff

under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2672.  The claim seeks

money damages in the amount of $3,500,000.00 for plaintiff's erectile dysfunction

and related injuries caused by negligence of the prison administrators and

physicians.  The BOP failed to make final disposition of the claim within six

months after it was filed.  Plaintiff therefore has exhausted his FTCA

administrative remedy and under 28 U.S.C. § 2675(a) is entitled to institute this

action under the FTCA against defendant United States.

**Exhaustion of Prison Administrative Remedies**

9.  Plaintiff has exhausted his federal prison administrative remedies with

respect to his claims for (a) money damages against prison administrators and

physicians sued in their personal capacities and (b) injunctive relief against the

United States.  On June 16, 2003, in Administrative Remedy No. 288852-A1, the

Bureau of Prisons denied on the merits plaintiff's final administrative appeal.  The

denial said:

> You allege you were denied medical treatment for priapism.  You also allege
> you were prescribed medication which caused this medical condition.  You
> state that you deserve treatment and monetary compensation for your
> condition. . . . There is no specific treatment which can reverse impotence
> caused by priapism.  It cannot be determined at this time that you have a
> permanent condition.  The Administrative Remedy Program does not
> provide for monetary relief.

**Parties and Timeliness of Claims Against Newly-Added Defendants**

10.  Plaintiff Derek Clinton Denton (Mr. Denton) is, and at all relevant times was, a federal prisoner confined at the United States Penitentiary in Atlanta , Georgia.  Plaintiff was born May 12, 1973, in Memphis, Tennessee.  Plaintiff is a citizen of the State of Tennessee.

11.  Defendant United States of America (United States), through the Bureau of Prisons and its officials, agents, and employees, operates the United States Penitentiary in Atlanta, Georgia.  Defendant is responsible for implementing equitable relief to which plaintiff is entitled and under the FTCA is liable to plaintiff for compensatory damages due to the negligence of its employees while acting within the scope of their offices or employment.

12.  Defendant John Yost (Assistant Warden Yost) at all relevant times was the Assistant Warden at the United States Penitentiary in Atlanta, Georgia.  He is sued in his personal capacity.  As to all relevant matters he acted under color of law.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's violation of the Constitution of the United States.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence unless the Attorney General under 28 U.S.C. § 2679(d)(1) properly certifies or the Court under § 2679(d)(3) certifies that defendant was an

employee of the United States and was acting within the scope of his office or employment at the time of the incidents out of which the negligence claims arose. If certification occurs, the United States shall be substituted as the party defendant for the negligence claims.

13.  Defendant Ron Wiley (Warden Wiley) at all relevant times was the Warden at the United States Penitentiary in Atlanta, Georgia.  He is sued in his personal capacity.  As to all relevant matters he acted under color of law. Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's violation of the Constitution of the United States.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence unless the Attorney General under 28 U.S.C. § 2679(d)(1) properly certifies or the Court under § 2679(d)(3) certifies that defendant was an employee of the United States and was acting within the scope of his office or employment at the time of the incidents out of which the negligence claims arose. If certification occurs, the United States shall be substituted as the party defendant for the negligence claims.

14.  Defendant Ivan L. Negron, MD (Dr. Negron) at all relevant times was a physician at the United States Penitentiary in Atlanta, Georgia.  He is sued in his personal capacity.  As to all relevant matters he acted under color of law.

Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's violation of the Constitution of the United States.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence unless the Attorney General under 28 U.S.C. § 2679(d)(1) properly certifies or the Court under § 2679(d)(3) certifies that defendant was an employee of the United States and was acting within the scope of his office or employment at the time of the incidents out of which the negligence claims arose. If certification occurs, the United States shall be substituted as the party defendant for the negligence claims.

15.  Defendant Victor R. Gonzalez, MD (Dr. Gonzalez) at all relevant times was a psychiatrist at the United States Penitentiary in Atlanta, Georgia.  He is sued in his personal capacity.  As to all relevant matters he acted under color of law. Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's violation of the Constitution of the United States.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence unless the Attorney General under 28 U.S.C. § 2679(d)(1) properly certifies or the Court under § 2679(d)(3) certifies that defendant was an employee of the United States and was acting within the scope of his office or employment at the time of the incidents out of which the negligence claims arose.

If certification occurs, the United States shall be substituted as the party defendant for the negligence claims.

16.  Defendant Efren Carbonell, MD (Dr. Carbonell) at all relevant times was a physician at the United States Penitentiary in Atlanta, Georgia.  He is sued in his personal capacity.  As to all relevant matters he acted under color of law. Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's violation of the Constitution of the United States.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence unless the Attorney General under 28 U.S.C. § 2679(d)(1) properly certifies or the Court under § 2679(d)(3) certifies that defendant was an employee of the United States and was acting within the scope of his office or employment at the time of the incidents out of which the negligence claims arose. If certification occurs, the United States shall be substituted as the party defendant for the negligence claims.

17.  Defendant Jenelle Foote, MD (Dr. Foote) was at all relevant times an urologist who treated plaintiff for priapism at the Atlanta Medical Center in Atlanta, Georgia.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence.

18.  Defendant Midtown Urology P.C. (Midtown Urology) was at all relevant times the employer of Dr. Foote.  As to all relevant matters Dr. Foote acted within the scope of her employment by Midtown Urology.  Midtown Urology is liable to plaintiff for money damages for any injury to plaintiff caused by Dr. Foote's negligence.

19.  Defendant Courtney D. Shelton, MD (Dr. Shelton) was at all relevant times a physician who, as plaintiff's Admitting Physician, treated plaintiff or was responsible for the treatment of plaintiff for priapism at the Atlanta Medical Center in Atlanta, Georgia.  Defendant is liable to plaintiff for money damages for any injury to plaintiff caused by defendant's negligence.  As to all relevant matters, defendant was responsible for supervising defendant D. Abernathy, MD (Dr. Abernathy) with respect to Dr. Abernathy's treatment of plaintiff.  Dr. Shelton is liable to plaintiff for money damages for any injury to plaintiff caused by her negligence in supervising Dr. Abernathy.  The original court complaint, filed November 9, 2004, did not name Dr. Shelton as a defendant because the medical records expressly state that Dr. Miriam Parker was both the Attending Physician and the Admitting Physician, and because the first reference to "Dr. Shelton" in the medical records is an entry by Dr. Abernathy on December 3, 2002, at 0200 hrs saying "Admit to Dr. Shelton."  By 0200 hrs on December 3, 2002, the claimed

negligent delay in treatment was over.  By telephone call December 16, 2004,

however, Atlanta attorney Kevin Race of the law firm of Insley & Race, who

represents Dr. Abernathy and Dr. Parker, told counsel for plaintiff that Dr. Parker

had said that she had not seen Mr. Denton, and that Mr. Denton had been admitted

to the care of Dr. Shelton, whose first name is Courtney.  By email on December

20, Mr. Race informed counsel for plaintiff that Dr. Parker maintains that all the

references in the medical records to her are erroneous, that she had no

responsibility for Mr. Denton's treatment, and that the admitting physician was Dr.

Courtney Shelton.  On December 23, 2004, counsel for plaintiff by first class mail

delivered to Dr. Shelton at the address stated for her in the caption of this First

Amended Complaint a letter stating in pertinent part as follows:

> Re:   *Denton v. US, et al.*, 1:04-cv-03285-RLV-AJB (U.S. D. Ct. N.D.
>       Ga. Complaint filed November 9, 2004)

Dear Dr. Shelton:

> This letter is notice to you that the case identified above has been filed
> in the United States District Court in Atlanta.  In part, the case alleges that
> Dr. D. Abernathy and other physicians negligently delayed proper treatment
> of Derek Denton at the Center on December 2-3, 2002.  Mr. Denton's Center
> Account No. is 5242649.  I am the principal attorney for Mr. Denton.  My
> Atlanta co-counsel is Brian Spears.

> The court complaint, filed November 9, 2004, did not name you as a
> defendant because the medical records expressly state that Dr. Miriam
> Parker was both the Attending Physician and the Admitting Physician, and
> because the first reference to "Dr. Shelton" in the medical records is an entry

by Dr. Abernathy on December 3, 2002, at 0200 hrs saying "Admit to Dr. Shelton."  By 0200 hrs on December 3, 2002, the claimed negligent delay in treatment was over.

By telephone call December 16, 2004, however, Atlanta attorney Kevin Race of the law firm of Insley & Race, who represents Dr. Abernathy and Dr. Parker, told me that Dr. Parker had said that she had not seen Mr. Denton, and that Mr. Denton had been admitted to the care of Dr. Shelton, whose first name is Courtney.  By email on December 20, Mr. Race informed me that Dr. Parker maintains that all the references in the medical records to her are erroneous, that she had no responsibility for Mr. Denton's treatment, and that the admitting physician was Dr. Courtney Shelton.

Upon reviewing the medical records again, I noticed that several entries by Dr. Abernathy also were signed by someone whose signature looks like "Curt JL" or "Curt SL."  The earliest of these entries by Dr. Abernathy was December 2, 2002 at 2340 hrs.  There is no indication, however, when "Curt JL" or "Curt SL" signed the entries, indicating assumption of responsibility for Mr. Denton's care.

If the signature that looks like "Curt JL" or "Curt SL" is your signature and if you assumed responsibility for care of Mr. Denton before urologist Dr. Jenelle Foote aspirated Mr. Denton's penis at about 0100 hrs on December 3, 2002 (as it now appears to me probably was the case), then Mr. Denton contends that you were among the doctors (including Dr. Abernathy and Dr. Foote) who negligently delayed Mr. Denton's treatment. For this reason, unless I receive information that convinces me otherwise, I at this time intend to file in the future on Mr. Denton's behalf an amended complaint naming you as a defendant and claiming that you (jointly with the other doctors) are liable to Mr. Denton for money damages for injury to him caused by negligent delay of his treatment.  I suggest that you retain legal counsel and I invite you, through your counsel, to present to me any information that you deem relevant.

On January 19, 2005, counsel for plaintiff received a telephone call from  Ms.

Sherry Rosen.  Ms. Rosen said that she worked for Huff, Powell & Bailey, LLC,

that Huff, Powell & Bailey, LLC represented Dr. Courtney Shelton, and that she

had received the December 23, 2004, letter to Dr. Shelton quoted above.

Plaintiff's claim against Dr. Shelton arises out of the conduct, transaction, or

occurrence set forth or attempted to be set forth in plaintiff's original pleading.

Within the period provided by Rule 4(m), Fed. R. Civ. Pro., for service of the

summons and complaint Dr. Shelton by her receipt of the December 23, 2004,

letter quoted above received such notice of the institution of the action that she will

not be prejudiced in maintaining a defense on the merits and knew or should have

known that, but for a mistake concerning the identity of the proper party (namely,

plaintiff's Admitting Physician), the action would have been brought against her.

Under Rule 15(c), Fed. R. Civ. Pro., this First Amended Complaint, including the

portion stating plaintiff's claim against Dr. Shelton, relates back to the date of

plaintiff's original pleading.

20. Defendant Matthew J. Goldstein, MD (Dr. Goldstein) was at all relevant

times a physician who, as plaintiff's Attending Physician, treated plaintiff or was

responsible for the treatment of plaintiff for priapism at the Atlanta Medical Center

in Atlanta, Georgia. Defendant is liable to plaintiff for money damages for any

injury to plaintiff caused by defendant's negligence. As to all relevant matters,

defendant was responsible for supervising defendant D. Abernathy, MD (Dr.

Abernathy) with respect to Dr. Abernathy's treatment of plaintiff.  Dr. Goldstein is

liable to plaintiff for money damages for any injury to plaintiff caused by his

negligence in supervising Dr. Abernathy.  The original court complaint, filed

November 9, 2004, did not name Dr. Goldstein as a defendant because the medical

records contain no legible indication that he was responsible for Mr. Denton's care

and expressly state that Dr. Miriam Parker was both the Attending Physician and

the Admitting Physician.  By letter dated January 20, 2005, however, Atlanta

attorney Kevin Race of the law firm of Insley & Race wrote to counsel for plaintiff

stating "we believe the signature on the lower right side of the medical record

entitled 'Atlanta Medical Center Emergency Physician Record Male Genitourinary

Problems' is that of Dr. Matthew Goldstein."  The medical record concerns

plaintiff's treatment for priapism at the Atlanta Medical Center and the signature is

on a line below which is printed "Attending" and to the right of which is printed

MD/DO."  On February 3, 2005, counsel for plaintiff by first class certified mail

0303 2460 0002 1222 6683 delivered to Dr. Goldstein at the address stated for him

in the caption of this First Amended Complaint a letter stating in pertinent part as

follows:

> Re:   *Denton v. US, et al.*, 1:04-cv-03285-RLV-AJB (U.S. D. Ct.
> N.D. Ga. Complaint filed November 9, 2004)

Dear Dr. Goldstein:

This letter is notice to you that the case identified above has been filed in the United States District Court in Atlanta.  In part, the case alleges that Dr. D. Abernathy, and other physicians including Dr. Jenelle Foote, negligently delayed proper treatment of Derek Denton at the Atlanta Medical Center on December 2-3, 2002.  Mr. Denton's Center Account No. is 5242649.  I am the principal attorney for Mr. Denton.  My Atlanta co-counsel is Brian Spears.

The court complaint, filed November 9, 2004, did not name you as a defendant because the medical records contain no legible indication that you were responsible for Mr. Denton's care and expressly state, as the enclosed Admission Record shows, that Dr. Miriam Parker was both the Attending Physician and the Admitting Physician.

By letter dated January 20, 2005, however, Atlanta attorney Frank Ilardi of the law firm of Insley & Race, who represents Dr. Abernathy and Dr. Parker, wrote to me that he and others believe that the signature on the "Attending" line in the lower right hand corner of the enclosed medical record is your signature.  Mr. Ilardi's firm previously had informed me that Dr. Parker had said that she had not seen Mr. Denton, that Dr. Parker maintains that all the references in the medical records to her are erroneous, and that she had no responsibility for Mr. Denton's treatment.

Based on the information from Mr. Ilardi identifying you as the doctor who signed on the "Attending" line, and unless I receive information that convinces me otherwise, I at this time intend to file in the future on Mr. Denton's behalf an amended complaint naming you as a defendant and claiming that you (jointly with the other doctors) are liable to Mr. Denton for money damages for injury to him caused by negligent delay of his treatment.  I suggest that you retain legal counsel and I invite you, through your counsel, to present to me any information that you deem relevant.

Copies of the medical records referenced in the letter were enclosed with the letter.

The internet website for the United States Postal Service confirmed that the letter

was delivered on February 5, 2005.  On February 23, 2005, counsel for plaintiff by

first class certified mail 7000 1530 0004 0282 1793 delivered to Dr. Goldstein at the same address another copy of the February 3, 2005 letter quoted above, with the referenced enclosures.  The internet website for the United States Postal Service confirmed that the letter was delivered on February 28, 2005.  Counsel for plaintiff subsequently received in the mail the United States Postal Service PS Form 3811, Domestic Return Receipt, for this letter, indicating that the letter had been delivered on February 28, 2005, and received by "G Sims."  On March 7, 2005, counsel for plaintiff called 404/265-3627, a telephone number listed as the Atlanta Medical Center Physician Referral Number, and asked for Dr. Matthew Goldstein.  Counsel was directed to call 404/265-4136, did so at 3:00 p.m. on March 7, 2005, and asked to speak with Dr. Matthew Goldstein.  The person who answered the phone said he was there but was "tied up with a trauma patient."  Counsel asked if there was a facsimile number to which counsel could send a letter to Dr. Goldstein and the person on the phone said "404/265-3675" and said "I'll put it in his box."  Later on March 7, 2005, counsel for plaintiff by facsimile addressed to Matthew Jay Goldstein and successfully transmitted to 404/265-3675 delivered to Dr. Goldstein another copy of the February 3, 2005 letter quoted above, with the referenced enclosures.  Plaintiff's claim against Dr. Goldstein arises out of the conduct, transaction, or occurrence set forth or attempted to be set

forth in plaintiff's original pleading.  Within the period provided by Rule 4(m),

Fed. R. Civ. Pro., for service of the summons and complaint Dr. Goldstein, by his

receipt of the February 3, 2005, letter quoted above on at least one of the three

occasions on which is was delivered to him, received such notice of the institution

of the action that he will not be prejudiced in maintaining a defense on the merits

and knew or should have known that, but for a mistake concerning the identity of

the proper party (namely, plaintiff's Attending Physician), the action would have

been brought against him.  Under Rule 15(c), Fed. R. Civ. Pro., this First Amended

Complaint, including the portion stating plaintiff's claim against Dr. Goldstein,

relates back to the date of plaintiff's original pleading.

21.  Defendant D. Abernathy, MD (Dr. Abernathy) was at all relevant times

a physician and resident and employee of defendant Tenet HealthSystem GB, Inc.

d/b/a Atlanta Medical Center who treated plaintiff for priapism at the Atlanta

Medical Center in Atlanta, Georgia.  Defendant is liable to plaintiff for money

damages for injury to plaintiff caused by defendant's negligence.  As to all relevant

matters, defendant acted under the supervision of Dr. Shelton, Dr. Goldstein, or

both, and acted within the scope of his employment by defendant Tenet

HealthSystem GB, Inc. d/b/a Atlanta Medical Center.

22.   Defendant Tenet HealthSystem GB, Inc. d/b/a Atlanta Medical Center
(Tenet HealthSystem) was at all relevant times the employer of Dr. Abermathy.
As to all relevant matters Dr. Abernathy acted within the scope of his employment
by Tenet HealthSystem.  Tenet HealthSystem is liable to plaintiff for money
damages for any injury to plaintiff caused by Dr. Abernathy's negligence.  The
court complaint, filed November 9, 2004, did not name Tenet HealthSystem as a
defendant because, at that time, plaintiff was mistaken as to the identity of Dr.
Abernathy's employer.  Plaintiff believed that Dr. Abernathy was self-employed,
not that he was employed by the hospital.  Plaintiff believed this because the Tenet
HealthSystem Conditions of Services document that Atlanta Medical Center staff
asked plaintiff to sign, and that he did sign, stated under the heading "Legal
Relationship Between Hospital and Physician" that "All physicians and surgeons
furnishing services to the patient, including the Emergency Department physicians,
radiologists, pathologists, anesthesiologists and the like, are independent
contractors with the patient and are not employees or agents of the hospital."
Plaintiff did not learn until December 20, 2004, from an email message that date
from Kevin Race to counsel for plaintiff, that Dr. Abernathy was an employee of
the Atlanta Medical Center.  On December 23, 2004, counsel for plaintiff by first

class mail delivered to Letton A. Hamblin, M.D. at the address stated below a letter

stating as follows:

> Letton A. Hamblin M.D.
> Registered Agent and
> Chief Executive Officer
> Atlanta Medical Center, Inc.
> 315 Boulevard NE, Suite 500
> Atlanta, Georgia 30312

> Re:   *Denton v. US, et al.*, 1:04-cv-03285-RLV-AJB (U.S. D. Ct. N.D. Ga.
> Complaint filed November 9, 2004)

Dear Dr. Hamblin:

This letter is notice to the Atlanta Medical Center, Inc. that the case identified above has been filed in the United States District Court in Atlanta. In part, the case alleges that Dr. D. Abernathy and other physicians were negligent in their treatment of Derek Denton at the Center on December 2-3, 2002.  Mr. Denton's Center Account No. is 5242649.  I am the principal attorney for Mr. Denton.  My Atlanta co-counsel is Brian Spears.

The court complaint, filed November 9, 2004, did not name the Atlanta Medical Center, Inc. as a defendant because the Tenet HealthSystem Conditions of Services document that Center staff asked Mr. Denton to sign, and that he did sign, stated in paragraph 6, "All physicians and surgeons furnishing services to the patient, including the Emergency Department physicians, radiologists, pathologists, anesthesiologists and the like, are independent contractors with the patient and are not employees or agents of the hospital."

By email message December 20, 2004, however, Atlanta attorney Kevin Race of the law firm of Insley & Race, who represents Dr. Abernathy, informed me that at the time in question Dr. Abernathy was an employee of the Atlanta Medical Center, Inc.

Based on this information from Mr. Race, I at this time intend to file in the future on Mr. Denton's behalf an amended complaint naming the Atlanta Medical Center, Inc. as a defendant and claiming that, under the doctrine of *respondeat superior*, the Center is liable to Mr. Denton for money damages for injury to him caused by the negligence of Dr. Abernathy or any other physician who at the time was an employee of the Center. In this regard, the medical records show the illegible signature of a person on a line designated for the signature of the Attending Physician. I have asked Mr. Race if his client can identify who that person is. Mr. Denton contends that this Attending Physician was negligent, along with Dr. Abernathy. If this Attending Physician was an employee of the Center at the time, then that employee's negligence is an additional basis for seeking recovery from the Center under the doctrine of *respondeat superior*.

Currently pending before the court is a motion by Mr. Denton to stay proceedings (other than discovery needed to effect service of process) until the United States decides an administrative claim by Mr. Denton under the Federal Tort Claims Act. (Mr. Denton is a federal prisoner. He claims that federal prison officials and doctors also were negligent in treating him for the same condition, priapism, for which he was treated at the Center. Mr. Denton claims that his priapism was not timely and properly treated, causing him to suffer permanent erectile dysfunction.) Depending on whether the United States will assume full responsibility for Mr. Denton's injuries if prison officials or doctors were negligent, and depending on other considerations, it is possible that an amended complaint might not pursue claims for negligence occurring at the Center. Should that be the case, then an amended complaint would not name the Center as a defendant. But if an amended complaint continues to name Dr. Abernathy or any other Center employee as a defendant, it will name the Center as a defendant as well, again under the doctrine of *respondeat superior*.

If Mr. Race is the Center's attorney in this matter as well as the attorney for Dr. Abernathy, then I expect I will so hear from him. If Mr. Race is not the Center's attorney in this matter, then I suggest that the Center retain legal counsel immediately so that the Center's attorney may be informed of and participate in communications about the case, even before the filing of an amended complaint.

By email message January 20, 2005, Frank Ilardi of the law firm of Insley & Race,

LLC informed counsel for plaintiff that he had received the December 23, 2005,

letter to Dr. Hamblin quoted above, that the correct corporate name for the Atlanta

Medical Center was Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center,

and that he  represented Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical

Center.  On February 3, 2005, counsel for plaintiff by first class mail delivered to

Mr. Ilardi a letter stating in pertinent part as follows:

> Re:   *Denton v. US, et al.*, 1:04-cv-03285-RLV-AJB (U.S. D. Ct. N.D. Ga.
> Complaint filed November 9, 2004)

> Dear Frank:

> * * *

> Based on your January 20 email message I understand that (1) you
> represent Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center
> regarding this matter; therefore (2) it would be improper for me to
> communicate regarding this matter directly with Tenet HealthSystem GB,
> Inc. d/b/a/ Atlanta Medical Center; and (3) regarding this matter, notice to
> Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center "of the
> institution of the action," within the meaning of Rule 15(c)(3)(A), Fed. R.
> Civ. P., is accomplished by providing notice to you.  Please let me know if
> any part of my understanding stated above is incorrect.  If my understanding
> is incorrect and notice to Tenet HealthSystem GB, Inc. d/b/a/ Atlanta
> Medical Center "of the institution of the action," within the meaning of Rule
> 15(c)(3)(A), Fed. R. Civ. P., must be delivered elsewhere, I ask that you tell
> me, if you know, to whom and at what address delivery must be made.

> On the assumption that my understanding stated above is correct, then
> this letter is notice to Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical
> Center "of the institution of the action," within the meaning of Rule

15(c)(3)(A), Fed. R. Civ. P.  The court complaint, filed November 9, 2004, did not name Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center as a defendant because, at that time, Mr. Denton was mistaken as to the identity of Dr. Abernathy's employer.  Mr. Denton believed that Dr. Abernathy was self-employed, not that he was employed by Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center.  Mr. Denton believed this because the Tenet HealthSystem Conditions of Services document that Atlanta Medical Center staff asked Mr. Denton to sign, and that he did sign, stated in paragraph 6, "All physicians and surgeons furnishing services to the patient, including the Emergency Department physicians, radiologists, pathologists, anesthesiologists and the like, are independent contractors with the patient and are not employees or agents of the hospital."  Mr. Denton did not learn until December 20, 2004, by an email message that date from Kevin Race, that Dr. Abernathy was an employee of the Atlanta Medical Center.  But for Mr. Denton's mistake as to the identity of Dr. Abernathy's employer, the action originally would have been brought against Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center.

At this time I intend to file in the future on Mr. Denton's behalf an amended complaint naming Tenet HealthSystem GB, Inc. d/b/a/ Atlanta Medical Center as a defendant and claiming that, under the doctrine of *respondeat superior*, the Center is liable to Mr. Denton for money damages for injury to him caused by the negligence of Dr. Abernathy or any other physician who at the time was an employee of the Atlanta Medical Center.

Plaintiff's claim against Tenet HealthSystem arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in plaintiff's original pleading. Within the period provided by Rule 4(m), Fed. R. Civ. Pro., for service of the summons and complaint Tenet HealthSystem, by Dr. Hamblin's receipt or Mr. Ilardi's receipt of the December 23, 2004, letter or February 3, 2005, letter quoted above, received such notice of the institution of the action that it will not be prejudiced in maintaining a defense on the merits and knew or should have known

that, but for a mistake concerning the identity of the proper party (namely, the

employer of Dr. Abernathy), the action would have been brought against it.  Under

Rule 15(c), Fed. R. Civ. Pro., this First Amended Complaint, including the portion

stating plaintiff's claim against Tenet HealthSystem, relates back to the date of

plaintiff's original pleading.  In addition, the running of the statute of limitations

applicable to plaintiff's claim against Tenet HealthSystem was tolled, and did not

start to run, until December 20, 2004, when Mr. Race informed counsel for

plaintiff that Dr. Abernathy was an employee of the Atlanta Medical Center.  This

is because the Tenet HealthSystem "Conditions of Services" document that Atlanta

Medical Center staff asked plaintiff to sign, and that he did sign, falsely stated, in a

paragraph entitled "Legal Relationship Between Hospital and Physician," that "All

physicians and surgeons furnishing services to the patient, including the

Emergency Department physicians, radiologists, pathologists, anesthesiologists

and the like, are independent contractors with the patient and are not employees or

agents of the hospital."  By this false statement defendant Tenet HealthSystem

fraudulently concealed its employment of Dr. Abernathy and its liability for

negligence committed by him within the scope of his employment.  To identify

appropriate defendants for the original complaint, plaintiff obtained and reviewed

his medical records, including the document containing defendant's false

statement.  Plaintiff's doing so was reasonable.  The intent of defendant's false

statement was to deter plaintiff from suing the hospital on a *respondeat superior*

basis for negligence of physicians and surgeons who, like Dr. Abernathy, were

employed by it.  The false statement did deter plaintiff from suing the hospital in

the original complaint.  In deciding not to sue the hospital in the original

complaint, plaintiff reasonably relied on defendant's false statement.

**Facts**

### Prison Psychiatrist's Negligent Failure to Advise Before Priapism Occurred

23.  On October 18, 2002, Dr. Gonzalez, a psychiatrist, treated Mr. Denton

for depression by increasing his daily dosage of Doxepin from 50 mg to 150 mg.

Dr. Gonzalez previously had treated Mr. Denton with Trazodone.  On October 18,

2002, Dr. Gonzalez knew that Mr. Denton has sickle cell trait.  Mr. Denton took

the Doxepin as prescribed, in a daily single dose taken at about 7:00 p.m.

24.  At no time did Dr. Gonzalez advise Mr. Denton that if he experienced

erection of his penis lasting two hours or longer he must seek emergency medical

treatment and not wait for normal prison sick call, because such an erection

threatens to cause permanent injury that could lead to impotence if not timely

treated.  Nor did Dr. Gonzalez give Mr. Denton any similar advice.  Mr. Denton

was not so advised by anyone until Dr. Foote did so after Mr. Denton was taken to the Atlanta Medical Center on December 2, 2002.

25.  A persistent erection is an urological emergency.  This disorder is called priapism.  Permanent tissue damage probably begins after an erection has lasted about four to six hours.  Once permanent tissue damage begins, it continues until the erection is resolved.  Continuation of the tissue damaging process eventually leads to permanent total erectile dysfunction (ED)--inability to obtain an erection, commonly called impotence.

26.  Priapism is relatively rare.  For this reason, it is not likely that all causes of priapism are known.  Sickle cell trait is known to be a priapism predisposing factor.  Some illicit drugs (marijuana, cocaine) and medicinal agents such as psychotropic medications--Trazodone, for example--are known to cause priapism in some men.  There are reports that Doxepin or an overdose of Doxepin may cause priapism.  A typical dosage of Doxepin for treatment of depression in an average adult is 25 mg three times a day.  A daily dosage of 150 mg is the maximum dosage that should be prescribed for a patient who is not hospitalized.  A patient who takes Trazodone or a patient with sickle cell trait who takes a daily dose of 150 mg of Doxepin has an elevated risk of experiencing priapism.

27.  It is not common public knowledge (and was not common knowledge in the fall of 2002) that a persistent erection is a medical emergency, that an erection lasting more than about four to six hours can start causing permanent tissue damage, and that if a persistent erection is not timely treated and resolved the tissue damaging process eventually leads to permanent total ED.  For this reason, doctors treating patients having an elevated risk of priapism should advise them that if they experience an erection lasting two hours or longer they must seek emergency medical treatment because such an erection threatens to cause permanent injury that could lead to impotence if not timely treated.

28.  A qualified psychiatrist who prescribes psychotropic medications such as Trazodone or Doxepin knows or should know that some psychotropic medications, including Trazodone, cause priapism in some men; that because it is not likely that all causes of priapism are known, it is likely that other medications will be discovered to cause priapism in some men; that sickle cell trait is a priapism predisposing factor; that a daily dosage of 150 mg is the maximum dosage of Doxepin that should be prescribed for a patient who is not hospitalized; that a patient who takes Trazodone, or a patient with sickle cell trait who takes a daily dose of 150 mg of Doxepin, has an elevated risk of experiencing priapism; and that because priapism is, but is not commonly known by the public to be, a

medical emergency requiring timely treatment to avoid the possibility of permanent injury, doctors treating patients having an elevated risk of priapism should advise them that if they experience an erection lasting two hours or longer they must seek emergency medical treatment because such an erection threatens to cause permanent injury that could lead to impotence if not timely treated.

29.  The statements in paragraphs 25-28 are accepted medical principles.

30.  Dr. Gonzalez breached the medical standard of care by prescribing Trazodone for Mr. Denton without instructing him that if he experienced an erection lasting two hours or longer he must seek emergency medical treatment because such an erection threatens to cause permanent injury that could lead to impotence if not timely treated.  On October 18, 2002, Dr. Gonzalez again breached the medical standard of care by prescribing the maximum daily dosage of Doxepin for Mr. Denton, a patient known to have sickle cell trait, without instructing Mr. Denton that if he experienced an erection lasting two hours or longer he must seek emergency medical treatment because such an erection threatens to cause permanent injury that could lead to impotence if not timely treated.  Dr. Gonzalez's breach of the standard of care continued every day thereafter that he failed to so instruct Mr. Denton.  The foregoing is true to a reasonable degree of medical certainty, based on accepted medical principles.

**November 16-18, 2002--Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; Violation of Sound, Accepted Prison Administrative Practice**

31.  On November 16, 2002, at about 1230 hrs, Mr. Denton went to the prison medical facility complaining of a painful erect penis that he had had for thirteen hours.  His complaint was true.  This was his first episode of priapism. Physician's Assistant (PA) S. Cabalza (PA Cabalza) saw the erection and notified Dr. Negron.  Dr. Negron instructed PA Cabalza to send Mr. Denton to Southwest Hospital to see an urologist as an emergency outpatient.  PA Cabalza at approximately 1:00 p.m. called Southwest Hospital to say that he was sending them a patient with priapism, but as Mr. Denton was about to board a van to go to the hospital, Assistant Warden Yost intervened and ordered prison staff and PA Cabalza not to send Mr. Denton to the hospital because his condition, Assistant Warden Yost said, was not life threatening.  Mr. Denton was given Dicyclomine. His erection softened about 1530 hrs and he was sent back to his housing unit.

32.  On November 16, 2002, no one advised Mr. Denton that recurrence of a full or partial erection lasting two hours or longer is a medical emergency threatening permanent injury and requiring that he return immediately to the prison medical facility and not wait for normal prison sick call.  (As stated above, no one advised Mr. Denton of this until Dr. Foote did so after Mr. Denton went to the

Atlanta Medical Center on December 2, 2002.)  No one advised him to discontinue

taking Doxepin.  He continued to take Doxepin as prescribed. After November 16,

2002, Mr. Denton was able to obtain a natural erection that subsided normally.

After November 16, 2002, Assistant Warden Yost continued to oppose transfer of

Mr. Denton to a hospital.  His opposition deterred the prison medical staff from

sending Mr. Denton to a hospital until late in the day on December 2, 2002.  The

following allegations are likely to have evidentiary support after a reasonable

opportunity for further investigation or discovery: Warden Wiley ratified,

supported, and strengthened the effect of Assistant Warden Yost's opposition to

transfer of Mr. Denton to a hospital.

33.  The medical record by PA Cabalza dated November 16, 2002, 1230 hrs,

states that Mr. Denton came to the prison medical facility complaining of a painful

erect penis that he had had for thirteen hours; PA Cabalza saw the erection and

notified Dr. Ivan Negron; and Dr. Negron recommended emergency hospital

outpatient consultation.  An entry by PA Cabalza at 1500 hrs states that the

consultation was cancelled; Dr. Negron was notified; and Mr. Denton was given

Dicyclomine, his penis relaxed, and he was returned to his prison-housing unit.

The record shows that on November 18, 2002, Dr. Negron reviewed and signed PA

Cabalza's November 16, 2002, record entries.

34.  A thirteen-hour erection of the penis is an urological emergency warranting treatment by an urologist.  Detumescence (relaxation) of the penis must be induced to stop the tissue damaging process.  The objective of treatment is to resolve the erection as soon as possible.  The proper initial treatment is to provide local treatment with cold compresses and administer an oral α (alpha) agonist, such as Sudafed.  If this does not resolve the erection, then injection of an α agonist such as epinephrine should be done, and the area of the injection should be massaged to work in the drug.  If the penis does not relax within a few minutes, a likely cause is clotting and thickening of the blood in the penis.  A needle should be inserted in the base of the penis to aspirate blood, improving blood flow.  These last two measures may be performed concurrently.  If this does not resolve the erection, a shunt connecting the inflow of blood to the penis to the outflow must be created.

35.  After treatment resolves the erection, the patient should be hospitalized for monitoring of his condition, to detect any recurrence.  Recurring episodes of priapism, as well as one long episode, can cause permanent ED.  The tissue damage caused by recurring episodes is additive, and where an initial episode has started to cause permanent tissue damage, a subsequent episode, even if shorter, can restart the tissue damaging process.  A patient who has suffered one episode of

priapism should seek immediate treatment of a subsequent erection that lasts two hours.

36.  The patient should be monitored by an urologist and medical staff supervised by an urologist.  Exclusive reliance should not be placed on the patient to detect and report recurrence because the tissue damaging process can start again in circumstances not easily recognized by the patient.  A full erection is not necessary for tissue damage to begin again.  A partial erection that a patient might not recognize to be a problem can start causing damage.  To enable the hospitalized patient to assist medical staff in detecting recurrence the patient should be informed that recurrence of an erection or partial erection lasting two hours or longer should be brought to the attention of medical staff.  The patient should be informed that such an erection is a medical emergency that, if not treated, could cause permanent injury leading to permanent total ED.

37.  If the patient is not hospitalized, or when the patient is discharged from the hospital, the patient must be instructed to seek immediate treatment of an erection or partial erection that lasts two hours.  The patient should be informed that such an erection is a medical emergency that, if not treated, could cause permanent injury leading to permanent total ED.

38.  In addition to monitoring to detect recurrence, efforts must be made to determine and eliminate possible causes of recurrence.  Because some illicit drugs (marijuana, cocaine) and medicinal agents such as psychotropic medications are known to cause priapism in some men, a patient with priapism must have a full history reviewed to determine if he is taking such medications.  If a patient taking a psychotropic medication such as Doxepin suffers an episode of priapism, the medication should be discontinued as a precaution.

39.  The statements in paragraphs 34-38 are accepted medical principles.

40.  On November 16, 2002, Dr. Negron breached the standard of care, committing medical malpractice, when he failed to (a) send Mr. Denton to a hospital; or (b) implement the treatment sequence stated above to resolve the erection promptly and thereafter monitor Mr. Denton's condition for recurrence, and instruct Mr. Denton (and prison guards controlling his movement) that any recurrence lasting at least two hours is a medical emergency threatening permanent injury and requiring that he return immediately to the prison medical facility and not wait for normal prison sick call.  In addition, Dr. Negron breached the standard of care, committing medical malpractice, when he failed either to discontinue Mr. Denton's psychotropic medication, Doxepin, or to consult an urologist about the

34

possible causes of Mr. Denton's priapism.  An urologist would have discontinued Mr. Denton's Doxepin.

41.  Any qualified medical doctor, including a general practitioner, knows that a thirteen-hour erection of the penis is not normal and constitutes an urological emergency warranting treatment by an urologist, that lengthy erections can cause permanent tissue damage leading to permanent ED, and that prompt treatment is required to resolve the erection as soon as possible to prevent or to stop the tissue damaging process.  Dr. Negron either knew or should have known these accepted medical principles.

42.  A qualified general practitioner also either knows and has the ability, medicine, and equipment to carry out the proper sequence of treatment--oral administration of an α agonist, followed by injection of an α agonist if necessary and/or aspiration of blood by insertion of a needle at the base of the penis, followed if necessary by a shunt procedure--or knows that her or his knowledge or ability in this regard is not equivalent to that of an urologist, or that available medicine or equipment may not be what an urologist would use, and that immediate transfer of the patient to a hospital for treatment by an urologist therefore is required.  Although it is not impossible that a general practitioner might have knowledge, ability, medicine, and equipment for treating priapism

equivalent to that of an urologist, that is not to be expected. What is expected of a general practitioner is knowledge that priapism is a medical emergency requiring immediate transfer to an emergency treatment facility, for treatment by an urologist.

43. The statements in paragraphs 40-42 are true to a reasonable degree of medical certainty, based on accepted medical principles.

44. The November 16, 2002, medical record indicates that Dr. Negron knew that priapism is a medical emergency requiring immediate transfer to an emergency treatment facility, for treatment by an urologist. It indicates that Dr. Negron's initial response was to recommend that Mr. Denton be taken immediately to a hospital emergency room.

45. Dr. Negron's actions after his initial response, however, fell below the standard of care, as stated above. His actions also constituted deliberate indifference to Mr. Denton's serious medical need. When Dr. Negron learned that prison officials had rejected his recommendation to send Mr. Denton to the hospital, Dr. Negron had a duty to tell the officials that Mr. Denton's condition was a medical emergency threatening to cause permanent ED; to tell them why appropriate treatment could not be provided by the prison clinic, if that was the case; and to insist that Mr. Denton be sent to the hospital. Alternatively, if Dr.

Negron had the knowledge, ability, medicine, and equipment to treat Mr. Denton properly in the prison clinic and to monitor him properly thereafter, he had a duty to provide this treatment and monitoring himself.  Dr. Negron fulfilled neither of these alternative duties.  The proper treatment sequence was not promptly provided.  Dicyclamine is not an α agonist, and the erection was not resolved until two and one-half hours after Mr. Denton arrived at the clinic.  No monitoring began and Mr. Denton was not properly instructed regarding the possibility of recurrence.  Dr. Negron neither reviewed Mr. Denton's medication and discontinued Doxepin nor consulted an urologist regarding the appropriateness of Mr. Denton's medication.

46.  Given his knowledge of Mr. Denton's condition, Dr. Negron's failure to perform either his duty to send Mr. Denton to the hospital or his duty to provide prompt proper treatment followed by monitoring, instruction of Mr. Denton regarding recurrence, medication review and either discontinuance of Doxepin or consultation with an urologist constituted deliberate indifference to Mr. Denton's serious medical need.  It also breached the standard of care.  It was negligence.  It was medical malpractice.

47. The statements in paragraphs 45 and 46 are true to a reasonable degree of medical certainty, based on accepted medical principles.

48.  The overruling by Assistant Warden Yost of Dr. Negron's initial recommendation to send Mr. Denton to a hospital was inconsistent with sound, accepted prison administrative practice.  It constituted negligence and deliberate indifference to Mr. Denton's serious medical need.  Alternatively, it was intentional deprivation of needed medical treatment to avoid expenditure.  Assistant Warden Yost failed to discuss Mr. Denton's condition with Dr. Negron.  Assistant Warden Yost overruled Dr. Negron solely on the ground that Mr. Denton's condition was not life threatening.  Mr. Denton, however, had a serious, if not life threatening, medical need.  His condition threatened to cause permanent ED if not properly treated.  Assistant Warden Yost either knew or did not know this.  Either way, his action constituted negligence and either deliberate indifference to Mr. Denton's serious medical need or intentional deprivation of needed medical treatment.

49.  That Dr. Negron had recommended Mr. Denton's immediate transfer to a hospital emergency room was an indication that Mr. Denton had a serious medical need.  If Assistant Warden Yost did not know the serious implications of untreated priapism, his decision to overrule Dr. Negron--a decision based on ignorance and made without consultation with the doctor--constituted reckless disregard for, and therefore deliberate indifference to, whether Mr. Denton had a serious medical need.  A prison administrator's overruling of a doctor's

recommendation--without consultation with the doctor and without knowledge of the medical implications--violates sound, accepted prison administrative practice. It is negligence.

50.   Alternatively, if Assistant Warden Yost knew that Mr. Denton's condition threatened to cause permanent ED if not properly treated, then his decision constituted negligence and reckless disregard for, and therefore deliberate indifference to, whether adequate treatment of Mr. Denton's serious medical need could be provided at the prison.  Dr. Negron's recommendation was an indication that adequate treatment could not be provided at the prison medical facility; yet Assistant Warden Yost denied Mr. Denton hospital emergency room treatment for his serious medical need, without making any inquiry, and therefore with reckless disregard for, whether proper treatment could be provided at the prison.  This denial constituted deliberate indifference to Mr. Denton's serious medical need and was inconsistent with sound, accepted prison administrative practice, and therefore negligent.

51.   The failure to send Mr. Denton to a hospital, to monitor his condition, and to instruct him (and prison guards controlling his movement) to return immediately to the prison medical facility in the event of recurrence of an erection lasting two hours continued after November 16, 2004.  So did the failure to

discontinue Doxepin or to consult an urologist about Mr. Denton's medications. PA Cabalza's entry at 1500 hrs on November 16 states that there was to be follow-up on November 17, but the medical records indicate that this never happened. The record shows that on November 18 Dr. Negron reviewed and signed PA Cabalza's November 16 entries.  At the time of Dr. Negron's review, the record showed that no follow up had occurred on November 17.  The records show that no follow-up occurred on November 18 either.  The records are correct; no follow-up occurred.  To a reasonable degree of medical certainty, based on accepted medical principles, the breach of the standard of care continued throughout this period.  So did the deliberate indifference and departure from sound, accepted prison administrative practice

**November 19-22, 2002--Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; Violation of Sound, Accepted Prison Administrative Practice**

52.  On November 19, 2002, at about 1100 hrs Mr. Denton went to the prison medical facility asking that his prostate be checked out because of the long, unnatural painful erection he had had on November 16.  He saw Dr. Negron.  He showed Dr. Negron his penis, which at that time was semi-erect and swollen with dark discoloration.  Dr. Negron provided no treatment regarding Mr. Denton's penis.  Mr. Denton was sent back to his housing unit.

53.  The medical record by PA Allyson Woods dated November 19, 2002,

1100 hrs states that Mr. Denton came to the prison medical facility asking that his

prostate be checked out because he had had an erection for twelve hours two days

ago.  The record states "found nothing . . . order u/a with culture."  The medical

records available to Mr. Denton do not record his visit to Dr. Negron and show no

entries for November 20-22, 2002.

54.  The breach of the standard of care; deliberate indifference; and

negligent departure from sound, accepted prison administrative practice noted

above continued on November 19, 2002, and through November 22, 2002.  The

semi-erect, swollen, discolored condition of Mr. Denton's penis on November 19

indicated recurrence of priapism and indicated that tissue damage likely was

happening at that time.  The standard of care required definitive treatment, as

stated above.  If Dr. Negron lacked knowledge, ability, or equipment to provide the

necessary treatment, the standard of care required that he immediately send Mr.

Denton to a hospital for treatment by an urologist.  In addition to treatment, Mr.

Denton, as previously noted, needed to be monitored and instructed to seek

immediate treatment of any recurrence of priapism lasting two hours.  Again, Dr.

Negron should have either discontinued the Doxepin or consulted an urologist,

who would have done so.  The foregoing is true to a reasonable degree of medical

certainty, based on accepted medical principles.

### November 23-24, 2002--Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; Violation of Sound, Accepted Prison Administrative Practice

55.  On November 23, 2002, at about 1000 hrs, Mr. Denton went to the

prison medical facility with a painful erection that he had had for about eight

hours.  Toradol and Bentyl (Dicyclomine) were administered and a cold compress

was applied.  At about 1500 hrs his erection subsided and softened, and he was

returned to his housing unit.

56.  The medical record by PA Cabalza (also noted by Dr. Negron) dated

November 23, 2002, 1000 hrs, states that Mr. Denton came to the prison medical

facility with a painful erection that he had had for eight hours.  The record states

that Toradol and Bentyl (Dicyclomine) were administered and a cold compress

applied, that Mr. Denton's erection subsided and softened, and that he was returned

to his housing unit at 1500 hrs.  There is no entry in the medical records for

November 24, 2002.

57.  The breach of the standard of care; deliberate indifference; and

negligent departure from sound, accepted prison administrative practice noted

above continued on November 23-24, 2002.  Mr. Denton's erection on November

42

23, reported to have lasted eight hours, indicated recurrence of priapism and indicated that tissue damage likely was happening at that time.  The standard of care required definitive treatment, as stated above.  If Dr. Negron lacked knowledge, ability, or equipment to provide the necessary treatment, the standard of care required that he immediately send Mr. Denton to a hospital for treatment by an urologist.  Use of only Toradol, Bentyl, and a cold compress was not appropriate because neither Toradol nor Bentyl is an α agonist; and a cold compress is unlikely to work and when it does it is likely to take too long.  Mr. Denton's erection continued for nearly five hours after he arrived in the prison medical facility.  Tissue damage likely occurred during this five-hour period (as it likely did during the preceding eight hours).  In addition to receiving prompt proper treatment, Mr. Denton, as previously noted, needed to be monitored and instructed to seek immediate treatment of any recurrence of priapism lasting two hours.  Again, the Doxepin should have been discontinued.  The foregoing is true to a reasonable degree of medical certainty, based on accepted medical principles.

**November 25-28, 2002--Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; Violation of Sound, Accepted Prison Administrative Practice**

58.  On November 25, 2002, at 1135 hrs, Mr. Denton went to the prison medical facility complaining that his penis was swollen and that he had had a

twelve-hour erection on November 23, 2002.  He saw Dr. Negron.  The only treatment Dr. Negron provided was to give Mr. Denton Motrin 800.

59.  On November 26, 2002, at about 1500 hrs, Mr. Denton went to the prison medical facility and said to PA Artacho that his penis had been hurting since November 24, 2002, and that his pain was eight on a scale of one to ten.  What he said was true.  He didn't receive any treatment for his penis other than the Motrin that he had been given before.

60.  The medical record by Dr. Negron dated November 25, 2002, 1135 hrs, states that Mr. Denton came to the prison medical facility complaining that his penis was swollen and stating that he had had a twelve-hour erection on November 23, 2002.  The record states that Dr. Negron gave Mr. Denton Motrin 800.  The record says, "Consult urologist next visit."

61.  The medical record dated November 26, 2002, 1500 hrs, indicates that Mr. Denton came to the prison medical facility stating that his penis had been hurting since November 24, 2002, and stating that his pain was eight on a scale of one to ten.  The record states "Penis -- appears to be Swollen."  Despite Dr. Negron's November 25 entry saying, "Consult urologist next visit," no urology consultation occurred.

62.  There is no entry in the medical records for November 27-28, 2002.

63.  The breach of the standard of care; deliberate indifference; and negligent departure from sound, accepted prison administrative practice noted above continued on November 25-28, 2002.  That Mr. Denton's penis appeared to be swollen on November 25 and 26 indicated potential recurrence of priapism and indicated that tissue damage may have been happening at that time, as the swelling may have been a partial erection.  Definitive treatment, as stated above, should have been provided.  Instead of recording on November 25 "Consult urologist next visit," Dr. Negron should have sent Mr. Denton to an urologist immediately, as he should have done before then, if he lacked the knowledge, ability, medicine, or equipment to provide proper treatment himself, as it appears he did.  Dr. Negron's November 25 order, moreover, was not carried out.  An urology consultation did not even occur during Mr. Denton's next visit, on November 26.  Again, after definitive treatment, Mr. Denton should have been monitored and properly advised to seek immediate treatment of any recurrence of priapism lasting two hours. Again, the Doxepin should have been discontinued.  The foregoing is true to a reasonable degree of medical certainty, based on accepted medical principles.

**November 29-December 1, 2002--Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; Violation of Sound, Accepted Prison Administrative Practice**

64.  On November 29, 2002, Mr. Denton's penis became erect around midnight (November 28-29).  Mr. Denton slept until the pain of this erection woke him later, and he went to the officer in charge a few hours later at around 0600 hrs on November 29, seeking medical treatment.  The PA was not available, and Mr. Denton had to wait until about 1100 hrs to be seen.  His penis was erect throughout that time.  When he was seen in the medical facility he said that his penis had been erect for many hours.  He was given Toradol, and an ice pack was applied to his penis.  He saw Dr. Negron and defendant Efren Carbonell, MD (Dr. Carbonell) and later saw Dr. Gonzalez.  Dr. Negron told him that Dr. Gonzalez had said that the Doxepin was not the cause of his priapism and that only Trazodone would cause priapism.  Dr. Gonzalez told Mr. Denton that the Doxepin was not the cause of his priapism and that he must continue to take it.  Mr. Denton continued to take it, as he had been.  His penis softened at about 1215 hrs and he was returned to his housing unit.

65.  The medical record by PA Cabalza dated November 29, 2002, 1100 hrs, states that Mr. Denton came to the prison medical facility with a hard, erect penis that he said he had had since a time not clearly legible, which may be 0600 hrs.

The record states that Toradol was given and an ice pack was applied to Mr. Denton's penis.  The entry at 1215 hrs states that his penis softened and he was returned to his housing unit.  The record states, "For referral to urology."

66.  There is no entry in the medical records for November 30 through December 1, 2002.

67.  The breach of the standard of care; deliberate indifference; and negligent departure from sound, accepted prison administrative practice noted above continued during November 29 through December 1, 2002.  Mr. Denton's erection on November 29, like his erection on November 23, indicates recurrence of priapism and indicates that tissue damage likely was happening at that time. Because the available medical staff apparently lacked knowledge, ability, or equipment to provide the necessary treatment, the standard of care required that Mr. Denton immediately be sent to a hospital for treatment by an urologist.  Use of only Toradol and an ice pack was not appropriate because Toradol is not an $\alpha$ agonist, and an ice pack is unlikely to work and when it does it is likely to take too long.  The medical record indicates that the ice pack caused Mr. Denton's erection to soften about an hour after it was applied.  Tissue damage likely occurred during this time (as it likely did during the preceding hours during which the erection occurred).  In addition to proper treatment, Mr. Denton, as previously noted,

needed to be monitored and instructed to seek immediate treatment of any

recurrence of priapism lasting two hours.  Again, the Doxepin should have been

discontinued.  The foregoing is true to a reasonable degree of medical certainty,

based on accepted medical principles.

### December 2, 2002--Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; Violation of Sound, Accepted Prison Administrative Practice

68.  On December 2, 2002, at about 1520 hrs, Mr. Denton went to the prison

medical facility with a painful erect penis that he said he had had since midnight.

What he said was true.  Mr. Denton saw PA Cabalza Dr. Carbonell, and Dr.

Negron.  They gave him Toradol and an intravenous saline solution and put a big

bag of ice on his penis.  This did not work, and the medical staff got very impatient

with his erect penis.  They told Mr. Denton to go back to his unit and put more ice

on it.  Mr. Denton told them he was not going back to his unit because they had a

job to do.  They gave him a direct order to go back to the unit or he would be put in

the hole, meaning the prison segregation unit.  Mr. Denton then left the medical

facility and went straight to his Unit Team, Mr. Reynolds and Mr. Stone.  He told

them that the medical staff had refused to treat him.  He showed Mr. Reynolds his

erect penis, which had turned black.  He told Mr. Reynolds it hurt like hell, which

was true.  Mr. Reynolds directed Mr. Stone to escort Mr. Denton back to the

medical facility to get treatment.  Mr. Stone did this.  Dr. Negron told Mr. Stone

the medical staff would handle things and asked him to leave.  Dr. Negron took

Mr. Denton into the chronic care treatment room.  He then said if this don't make it

go down then nothing will.  He then started putting a catheter in Mr. Denton's

penis.  He did not give Mr. Denton anything for pain.  Mr. Denton started

screaming.  Dr. Negron said sit still or the balloon on the end of the tube would

mess up Mr. Denton if it fell off the tube.  Mr. Denton was screaming so loud that

a Nurse named Ms. Quintyne ran inside the chronic care room and asked what they

were doing to have Mr. Denton screaming like that.  Mr. Denton asked if he was

going to the hospital because his penis was not going down.  Dr. Carbonell told

Mr. Denton that they couldn't send him to the hospital right then.  Mr. Denton

asked them if they were they waiting for Assistant Warden Yost to leave the

building and go home.  Dr. Carbonell said Assistant Warden Yost had told them

not to send Mr. Denton to the hospital.  The next man that was in charge under

Assistant Warden Yost was Mr. Dunken.  He was still in the building.  He signed

off on the paperwork for Mr. Denton to be escorted to the Atlanta Medical Center.

69.  The medical record by Dr. Carbonell/PA Cabalza dated December 2,

2002, 1520 hrs, states that Mr. Denton came to the prison medical facility with a

painful erect penis that he said he had had since midnight.  The record states that

Toradol and an intravenous saline solution were administered, that Dr. Negron inserted a catheter, that Dr. Gonzalez ordered Doxepin discontinued temporarily, and that an ice compress was applied to Mr. Denton's penis.  Entries at 1700 hrs state that Demerol and Phenergan were given, and that absent improvement Mr. Denton would be taken to a hospital.

70.  Mr. Denton arrived at the Atlanta Medical Center at about 2010 hrs on December 2, 2002.  He said that he had had an erection for about eighteen hours, and similar erections off and on for two weeks.  Dr. Abernathy and attending physician Dr. Goldstein gave Mr. Denton terbutaline, saline solution, and Demerol.  Terbutaline was given starting at 2117 hrs.  The medication did not soften Mr. Denton's erection.  At about 0100 hrs on December 3, 2002, Dr. Foote aspirated and irrigated Mr. Denton's penis, resolving the erection.

71.  Dr. Foote told Mr. Denton that an erection lasting more than two hours is a medical emergency requiring hospital treatment.  She asked Mr. Denton why he hadn't come to the emergency room sooner, and he told her that the prison staff would not let me come earlier.  Dr. Foote told Mr. Denton that he may not be able to obtain an erection since priapism had persisted for more than 24 hours.  Dr. Foote told Mr. Denton that he may have impotence as a consequence of ischemic injury to his penis associated with erection for approximately 24 hours.

72.  Atlanta Medical Center records indicate that Mr. Denton arrived at the

Center at 2010 hrs on December 2, 2002; that he complained of an erection for

eighteen hours off and on for two weeks; and that at 2030 hrs Dr. Abernathy

recorded the complaint as priapism starting twelve hours previously with similar

symptoms during that past two weeks, noted Mr. Denton's sickle cell trait and

Doxepin prescription, and discussed Mr. Denton's condition with Dr. Foote.  The

records indicate that Mr. Denton's erection was unresponsive to terbutaline, saline

solution, and Demerol.  Terbutaline had been given starting at 2117 hrs.  At

approximately 0100 hrs on December 3, 2002, Dr. Foote resolved the erection by

aspirating and irrigating with dilute neosynephrine the corpora of Mr. Denton's

penis.  Dr. Foote noted that dark blood flowed first, indicating poorly oxygenated

tissues, and that bright red blood indicating good oxygenation flowed thereafter.

She recorded her impression that sickle cell trait and Doxepin may have caused

Mr. Denton's priapism, though she noted that the Physician's Desk Reference does

not mention association of Doxepin with priapism.  She recommended admission

to the hospital overnight for hydration, pain management, ice packs if needed, and

observation.  She recommended subcutaneous administration of terbutaline if

priapism occurs.  The records correctly state the treatment that was afforded by Dr.

Abernathy, Dr. Goldstein, and Dr. Foote, and the communication among them; and

correctly describes the results of the treatment and the appearance of Mr. Denton's blood.

73.  A medical record by Dr. Foote dated December 3, 2002, 0755 hrs, includes direction to discontinue Doxepin.  It says she informed Mr. Denton that he may not be able to obtain an erection since priapism had persisted for more than 24 hours.  It says she advised Mr. Denton that he may have impotence as a consequence of ischemic injury to his penis associated with erection for approximately 24 hours.  Dr. Foote wrote that Mr. Denton must be seen by an urologist for aggressive treatment if he has another episode of priapism greater than four hours.  Dr. Foote wrote Mr. Denton a prescription for terbutaline, to be taken if he has an erection lasting more than two hours.  The prescription form says that if erection persists, call an urologist immediately.

74.  The breach of the standard of care; deliberate indifference; and negligent departure from sound, accepted prison administrative practice noted above continued until the prison medical staff sent Mr. Denton to the Atlanta Medical Center late in the day on December 2, 2002.  Mr. Denton's erection on December 2, like those on November 23 and 29, indicated recurrence of priapism and indicated that tissue damage likely was happening at that time.  As on November 23 and 29, the standard of care required definitive treatment or

emergency referral to an urologist for definitive treatment.  Neither occurred.  No α agonist was administered (Demerol is a painkiller), and nearly five hours elapsed from the time Mr. Denton arrived at the prison clinic until the time he arrived at the Atlanta Medical Center.  The foregoing is true to a reasonable degree of medical certainty, based on accepted medical principles.

75.  At the Atlanta Medical Center, nearly five hours elapsed from the time Mr. Denton arrived (2010 hrs) until his erection was resolved by aspiration and irrigation (0100 hrs).  This delay breached the standard of care.  As the medical records show, Dr. Abernathy, Admitting Physician Dr. Shelton, Attending Physician Dr. Goldstein, and Dr. Foote were responsible for this breach, as each knew or should have known Mr. Denton's condition on arrival, knew or should have known his reported recent history of lengthy episodes of priapism, knew or should have known of his need for prompt proper treatment, and knew or should have known during the period of the delay that prompt proper treatment was not being afforded.  When Mr. Denton's erection was unresponsive for more than twenty minutes to the terbutaline that was administered beginning at 2117 hrs, aspiration of his penis should have been promptly performed.  It was not performed, however, until more than three hours later.  Tissue damage likely

occurred throughout this time.  The foregoing is true to a reasonable degree of

medical certainty, based on accepted medical principles.

### Injury Proximately Caused by Breach of the Medical Standard of Care; Deliberate Indifference to Serious Medical Need; and Violation of Sound, Accepted Prison Administrative Practice

76.  Priapism lasting less than twelve hours, though likely to cause some

permanent tissue damage, is not likely to cause detrimental change that diminishes

satisfaction from erectile function.  A male who due to permanent tissue damage

suffers 10% permanent diminution of erectile function is unlikely to notice the

loss.  Erectile function that is 90% of normal erectile function is likely to be just as

satisfactory as normal erectile function.  Erectile function that is 50% of normal

erectile function is not enough to be unsatisfactory.  Priapism lasting longer than

twelve hours creates a risk of causing some measure of permanent ED that will

cause some reduction in satisfaction from erectile function.  Priapism lasting

longer than twenty-four hours creates a risk of severe permanent tissue damage

causing permanent total ED.  Priapism lasting longer than forty-eight hours is very

likely to cause permanent total ED.  An article published in 2002, H. Sadeghi-

Nejad and A. Seftel, *The Etiology, Diagnosis, and Treatment of Priapism: Review

of the American Foundation for Urologic Disease Consensus Panel Report*,

Current Urology Reports 2002, 3: 492-498, correctly states:

Ischemic priapism persisting for longer tha[n] 4 hours indicates the presence of a compartment syndrome and may require emergency medical intervention to avoid the potential consequences of irreversible corporal fibrosis and permanent ED. . . .

Severe cellular damage and widespread necrosis may result from priapism lasting longer than 24 hours.  Destruction of the endothelial lining, formation of blood clots within the corpora, widespread transformation of the smooth muscle cells to fibroblast-like cells, or necrosis occurs in patients in whom priapism lasts beyond 48 hours, eventually resulting in irreversible ED.  The lack of detrimental changes associated with priapism lasting less than 12 hours emphasizes the importance of early intervention and patient education in the management of this disorder. . . .

[M]ost patients with veno-occlusive priapism treated without excessive delay (within 12 hours or less) will respond to α-agonist therapy, and . . . failure of resolution by 20 minutes after injection (0.1 mL/minute of a 500 µg/mL phenylephrine solution, total infused dose of 1 mg) indicates a need for alternative treatment strategies.  The AFUD-TLP highly recommends first line treatments (aspiration and irrigation) for low-flow priapism of more than 4 hours duration before progressing to placement of more invasive surgical shunts; however, they also acknowledge that conservative therapies have not demonstrated a benefit for preserving potency when priapism has persisted beyond 72 hours.  [References omitted.]

77.  Whether a priapism patient has suffered permanent ED can be determined objectively through physical examination, other tests (an injection test or a nocturnal penile tumescence study conducted over two or three nights), and consideration of the patient's history.

78.  Suffering permanent total or significant ED is mentally and emotionally distressing.  It can cause depression and can aggravate previously existing depression.

79.  In some but not all patients with permanent ED, surgical placement of a penile implant can restore a degree of erectile function adequate for sexual performance.  In some cases, tissue has become so damaged and scarred that an implant cannot be placed.  By examining the penis, an urologist can make an initial assessment of the likelihood that an implant can be placed.  Where initial examination indicates that tissue damage might be so great as to preclude placement of an implant, final determination can be made only by attempting the surgical procedure.  The cost of penile implant surgery can reach $20,000 to $50,000, depending on the type of implant used, whether surgical or mechanical complications occur, and variation in professional fees and hospital costs. Where an implant is possible, the results of surgery vary.  An implant is not a cure for ED.  It is a substitute for normal erectile function.  The extent to which it is satisfactory varies from patient to patient.

80.  The statements in paragraphs 76-79 are accepted medical principles.

81.  Based on the documented history of Mr. Denton's case, it is more probable than not, indeed almost certain, that Mr. Denton has suffered permanent

significant or total ED.  More likely than not, he has suffered permanent total ED

though it is possible that examination and tests may determine that his ED is less

than total.

82.  It is unlikely that the first thirteen hours of Mr. Denton's first priapism

episode on November 16, 2002, caused by itself a degree of permanent ED great

enough to result in significantly diminished satisfaction from erectile function.

Rather, breach of the medical standard of care on and after November 16, stated

above, proximately caused Mr. Denton to suffer permanent significant or total ED,

as did the related deliberate indifference and departure from sound prison

administrative practice, also reported above.  The first thirteen hours of Mr.

Denton's first priapism episode on November 16 was a contributing cause of his

permanent ED, because the continuation of that episode after he arrived at the

prison clinic for treatment, and each priapism episode thereafter, continued the

tissue damaging process that likely began during the first thirteen hours of

priapism on November 16.

83.  On and after November 16, Mr. Denton suffered repeated lengthy

episodes of untreated priapism due to (a) the failure of Dr. Gonzalez to instruct Mr.

Denton to seek immediate treatment of any erection lasting over two hours,

because an erection lasting longer than about four to six hours can start causing

irreversible tissue damage and absent timely effective treatment a persistent erection can lead to permanent total ED; and (b) the failure of the prison medical staff, particularly Dr. Negron, during the initial clinical visit on November 16, and each day thereafter, to start monitoring Mr. Denton's condition and to advise Mr. Denton (and to advise prison guards controlling his movement) that if he had another painful erection lasting at least two hours, he needed to get to the clinic immediately for treatment, for the reasons stated above. These failures continued every day until Mr. Denton finally was sent to the hospital on December 2, 2002.

84. As an alternative to so advising Mr. Denton and starting to monitor him on November 16, the prison medical staff could have sent Mr. Denton immediately to an urologist, who would have monitored and advised him (as Dr. Foote did). Dr. Negron and the rest of the prison medical staff, however, failed to do either alternative. On November 16, after Assistant Warden Yost overruled Dr. Negron's directive to take Mr. Denton to a hospital, the staff simply sent Mr. Denton back to his cell after his erection resolved, without monitoring him or telling him what to do if he got another persistent, painful erection.

85. The statements in paragraphs 81-84 are true to a reasonable degree of medical certainty, based on accepted medical principles.

86.  As a result of the failures of Dr. Gonzalez, Dr. Negron, and the other prison medical staff to instruct Mr. Denton properly, Mr. Denton did not know that if he had an erection lasting at least two hours he needed to get treated immediately.  Because he didn't know this (and because of the lack of monitoring on and after November 16), each time he got such an erection he simply endured it for many hours, all through the night (beginning shortly after midnight), waiting to go on sick call at the normal, standard time for prison sick call.

87.  On November 23 Dr. Negron and other prison medical staff members again failed properly to advise Denton (and the prison guards).  They also failed to start monitoring Mr. Denton's condition.  The same failure to advise and monitor, with the same consequence, was repeated on November 25 and November 29. Because of the failure to advise and instruct Mr. Denton properly on and after October 18, and the failure to start monitoring him properly on and after November 16, Mr. Denton endured three long, tissue damaging erections throughout the early morning hours (beginning shortly after midnight) of November 16 (thirteen hours), November 23 (eight hours), November 29 (thirteen hours), and December 2 (fifteen hours) before he reported to sick call at the normal sick call time on those days.  The failures of Dr. Gonzalez, Dr. Negron and other prison medical staff members properly to advise and instruct Mr. Denton proximately caused these

lengthy, damaging episodes of untreated priapism.  These episodes were painful.
More important, the cumulative damage they caused was a proximate cause of Mr.
Denton's permanent ED, which, more likely than not, is permanent total ED.
Permanent total ED is a natural probable consequence, reasonably to be expected,
from such repeated episodes of priapism.

88.  In addition, Mr. Denton also endured one or more likely tissue
damaging semi-erections between November 16 and 23, and between November
23 and 29.  These semi-erections likely were contributing causes of Mr. Denton's
permanent ED.

89.  Other breaches of the standard of care, deliberate indifference, and
departures from sound practice proximately caused pain and were either
contributing causes or by themselves proximate causes of Mr. Denton's permanent
ED.  Dr. Negron's failure properly to treat Mr. Denton's swollen, semi-erect penis
on November 19, 2002, was a contributing cause, because it is likely that Mr.
Denton's condition on that day was an episode of priapism that contributed to the
cumulative damage.  The same is true of the failure to properly treat Mr. Denton's
swollen penis on November 25 and 26.

90.  The failure properly to treat Mr. Denton on November 16 was a
contributing cause, as it resulted in damaging priapism continuing for two and one-

half hours after his arrival at the prison clinic.  The failure properly to treat Mr.

Denton on November 23 caused him to suffer five hours of damaging priapism

after he arrived at the clinic.   The failure of Dr. Negron and Dr. Carbonell on

December 2, 2002, promptly either to treat Mr. Denton properly or to send him to

the hospital caused him to suffer nearly five hours of priapism after he arrived at

the prison clinic.  These post-arrival hours of priapism on November 16 and 23 and

December 2 added to the cumulative damage because they extended the duration

of the erections that had begun before Mr. Denton arrived for treatment on those

days.

91.  The statements in paragraphs 87-90 are true to a reasonable degree of

medical certainty, based on accepted medical principles.

92.  On November 16 and continuing through late in the day on December 2,

the refusal of prison officials including Assistant Warden Yost to allow Mr.

Denton to be taken to a hospital also was a proximate cause of Mr. Denton's

permanent ED, because it was a proximate cause of all of the failings of the

medical staff.

93.  By the time Mr. Denton arrived at the Atlanta Medical Center at 2010

hrs on December 2, 2002, it is more probable than not, indeed almost certain, that

it was too late to prevent Mr. Denton from suffering the permanent significant ED

he has suffered.  More likely than not, his permanent ED is total ED (though it is

possible that examination and testing may determine that his ED is less than total).

Permanent total ED is a natural probable consequence, reasonably to be expected,

from just the repeated episodes of priapism that Mr. Denton suffered before

seeking treatment on November 23, November 29, and December 2.  When the

other hours of damaging priapism due to the other breaches, deliberate

indifference, and departures from sound practice noted above are added, it is

almost certain that the Atlanta Medical Center could not prevent Mr. Denton from

suffering permanent significant ED, which likely is permanent total ED.

Nonetheless, delay at the Atlanta Medical Center proximately caused some

additional tissue damage.  This additional tissue damage may have increased the

extent of Mr. Denton's permanent ED.  As noted above, however, it is more

probable than not that by the time Mr. Denton arrived at the Atlanta Medical

Center it was too late to prevent Mr. Denton from suffering the permanent

significant ED he has suffered.

94.  As a result of suffering permanent significant ED, Mr. Denton has

suffered and will continue to suffer mental and emotional distress, including

exacerbation of his pre-existing depression.  There is a substantial risk that an

implant will not be possible.  Examination of Mr. Denton likely can clarify the

chance of success, but final determination may not be possible until surgery costing perhaps $20,000 to $50,000 is attempted.  There also is a substantial risk that for Mr. Denton an implant, if possible, will be only a minimally satisfactory substitute for natural erectile function.

95.  The statements in paragraphs 93 and 94 are true to a reasonable degree of medical certainty, based on accepted medical principles.

96.  Ever since December 2, 2002, Mr. Denton has been unable to have an erection.  He believes he now is impotent.  Dr. Barnes, an urologist who visits the prison, told Mr. Denton that he might need a penile implant.  Mr. Denton asked Dr. Barnes whether he could provide Mr. Denton that surgery.  Dr. Barnes said his hands were tied and the institution would not allow him to provide it.  Defendant United States of America has refused, and continues to refuse, to provide Mr. Denton any assessment of his suitability for penile implant surgery or other proper assessment, diagnosis, or treatment of his ED, other than mental health treatment.

97.  Mr. Denton is mentally and emotionally devastated by his ED.  He feels betrayed, angry, anxious, helpless, and depressed.  A December 23, 2002, medical record reports that Mr. Denton said he felt betrayed and depressed.  On about December 9, 2002, Mr. Denton started and continued for many weeks a hunger strike because of his ED.  He lost weight and became severely dehydrated.  Several

medical records indicate that on December 9, 2002, Mr. Denton started and

continued a hunger strike because of his ED.  A medical record dated July 16,

2003, reports diagnoses of severe dehydration, acute anxiety, depression, and

erectile dysfunction.  Mr. Denton sees psychologist Dr. Pinnex Hall regularly for

his anxiety and depression.  He takes prescription medication for his anxiety and

depression.  He understands that he will need mental health treatment for the rest

of his life.

98.  The declaration and affidavit of urologist George F. Ellis, MD, a

competent expert witness, filed as an attachment to Mr. Denton's original

complaint and hereby incorporated by reference as an attachment to this First

Amended Complaint, supports Mr. Denton's medical malpractice claims.

**Claims**

### Prison Administrators' Negligence

99.  Under Georgia law of negligence, Assistant Warden Yost is liable to

Mr. Denton for compensatory damages for past and future loss of sexual function,

past and future pain and suffering, past and future mental and emotional distress,

and future medical expenses--unless the United States is substituted as the

defendant for this claim, making the United States liable under the FTCA for

compensatory damages for these injuries.  Also, the United States is liable to Mr.

Denton for equitable relief requiring proper assessment and treatment of his ED including, if appropriate, penile implant surgery.

100.  The following claim is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery: under Georgia law of negligence, Warden Wiley is liable to Mr. Denton for compensatory damages for past and future loss of sexual function, past and future pain and suffering, past and future mental and emotional distress, and future medical expenses--unless the United States is substituted as the defendant for this claim, making the United States liable under the FTCA for compensatory damages for these injuries. Also, if Warden Wiley is so liable, the United States is liable to Mr. Denton for equitable relief requiring proper assessment and treatment of his ED including, if appropriate, penile implant surgery.

**Prison Physicians' Medical Malpractice**

101.  Under Georgia law of medical malpractice, Dr. Gonzalez, Dr. Negron, and Dr. Carbonell are liable to Mr. Denton for compensatory damages for past and future loss of sexual function, past and future pain and suffering, past and future mental and emotional distress, and future medical expenses--unless the United States is substituted as the defendant for these claims, making the United States liable under the FTCA for compensatory damages for these injuries. Also, the

United States is liable to Mr. Denton for equitable relief requiring proper

assessment and treatment of his ED including, if appropriate, penile implant

surgery.

### Prison Administrators' Constitutional Violations

102.  Under the Eighth Amendment to the Constitution of the United States,

for deliberate indifference to Mr. Denton's serious medical need or intentional

deprivation of medical treatment, Assistant Warden Yost is liable to Mr. Denton

for compensatory damages for past and future loss of sexual function, past and

future pain and suffering, past and future mental and emotional distress, and future

medical expenses; and for punitive damages.  Also, the United States is liable to

Mr. Denton for equitable relief requiring proper assessment and treatment of his

ED including, if appropriate, penile implant surgery.

103.  The following claim is likely to have evidentiary support after a

reasonable opportunity for further investigation or discovery: under the Eighth

Amendment to the Constitution of the United States, for deliberate indifference to

Mr. Denton's serious medical need or intentional deprivation of medical treatment,

Warden Wiley is liable to Mr. Denton for compensatory damages for past and

future loss of sexual function, past and future pain and suffering, past and future

mental and emotional distress, and future medical expenses; and for punitive

damages.  Also, if Warden Wiley is so liable, the United States is liable to Mr.

Denton for equitable relief requiring proper assessment and treatment of his ED

including, if appropriate, penile implant surgery.

### Prison Physicians' Constitutional Violations

104.  Under the Eighth Amendment to the Constitution of the United States,

for deliberate indifference to Mr. Denton's serious medical need, Dr. Gonzalez, Dr.

Negron, and Dr. Carbonell are liable to Mr. Denton for compensatory damages for

past and future loss of sexual function, past and future pain and suffering, past and

future mental and emotional distress, and future medical expenses; and each is

liable for punitive damages. Also, the United States is liable to Mr. Denton for

equitable relief requiring proper assessment and treatment of his ED including, if

appropriate, penile implant surgery.

### Prison Defendants' Joint and Several Liability for Compensatory Damages

105.  The defendants identified in paragraphs 99-104 who are liable to Mr.

Denton for compensatory damages stated in those paragraphs are jointly and

severally liable for those damages.

### Private Physicians' Medical Malpractice

106.  Under Georgia law of medical malpractice, Dr. Foote, Midtown

Urology, Dr. Goldstein, Dr. Shelton, Dr. Abernathy, and Tenet HealthSystem are

liable to Mr. Denton for compensatory damages for past and future loss of sexual function, past and future pain and suffering, past and future mental and emotional distress, and future medical expenses.

### Joint and Several, or Separate, Liability of Private Physicians

107.  Defendants identified in paragraph 106 are jointly and severally liable for the damages stated in that paragraph.  These defendants are either (a) jointly and severally liable with liable defendants identified in paragraph 105, for the injuries identified in paragraphs 99-104, or (b) separately liable for any distinguishable injuries caused only by them.

**Relief**

108.  Mr. Denton asks the Court to enter judgment in his favor and against defendants for compensatory and punitive damages, in accordance with paragraphs 99-107.

109.  Mr. Denton asks the Court to enter an injunction requiring defendant United States of America and appropriate officers, employees, and agents to assess Mr. Denton properly for penile implant surgery, to provide this surgery if appropriate, and to provide any other appropriate assessment or treatment of Mr. Denton's ED.

110.  Mr. Denton asks the Court to enter an injunction precluding defendant United States of America and its prison administrative officials, employees and agents having custody of Mr. Denton from overruling physicians' orders for assessment or treatment of Mr. Denton's medical conditions.

111.  Mr. Denton asks the Court to award him such additional or alternative relief as the Court deems just.

**Jury Demand**

114. Mr. Denton demands a jury trial of each of his claims, except for his claims against the United States.

Respectfully submitted,

**s/George Brian Spears, Esq.**
Attorney Bar Number: 670112
Attorney for Derek Clinton Denton
Brian Spears Attorney at Law
1126 Ponce De Leon Avenue, N.E.
Atlanta, Georgia 30306
Telephone: (404) 872-7086
Facsimile: (404) 892-1128
Email: bspears@mindspring.com

**<u>s/Daniel M. Schember, Esq.</u>**
Pro Hac Vice
Attorney for Derek Clinton Denton
Gaffney & Schember, P.C.
1666 Connecticut Avenue, N.W., Suite 225
Washington, D.C. 20009
Telephone: (202) 328-2244
Facsimile: (202) 797-2354
Email: dclaw@radix.net


Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2005, I electronically filed plaintiff's First

Amended Complaint with the Clerk of Court using the CM/ECF system, which will

automatically send email notification of such filing to the following attorneys of record:

None

I hereby certify that I have mailed by the United States Postal Service the

document to the following non-CM/ECF participants:

R. David Powell
Assistant United States Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303-3309

D. Gary Lovell, Jr.
Carlock, Copeland, Semler & Stair, LLP
2600 Marquis Two Tower
285 Peachtree Center Avenue
Atlanta, GA 30303-1235

Jeffrey F. Peck
ulmer berne llp
600 Vine Street, Suite 2800
Cincinnati, OH 45202-2409

Lawrence W. Rosenblatt
Insley & Race
2 Midtown Plaza
1349 W. Peachtree Street, N.W.
Suite 1450
Atlanta, GA 30309

Rolfe M. Martin
Owen, Gleaton, Egan,
Jones & Sweeney, LLP
1230 Peachtree Street, N.E.
Suite 1400
Atlanta, GA 30309-3574

John Yost, Assistant Warden
USP Atlanta
601 McDonough Blvd S.E.
Atlanta, GA 30315

Ron Wiley, Warden
USP Florence, PO Box 7500
588 State Hwy 67 South
Florence, CO 81226

Ivan L. Negron, MD
FCI Tallahassee
501 Capital Circle, N.E.
Tallahassee, FL 32301-3572

Victor R. Gonzalez, MD
Psychiatrist
USP Health Services Atlanta
601 McDonough Boulevard SE
Atlanta, GA 30315

Efren Carbonell, MD
FCI Tallahassee
501 Capital Circle, N.E.
Tallahassee, FL 32301-3572

**s/Daniel M. Schember, Esq.**
Pro Hac Vice
Attorney for Derek Clinton Denton

Gaffney & Schember, P.C.
1666 Connecticut Avenue, N.W., Suite 225
Washington, D.C. 20009
Telephone: (202) 328-2244
Facsimile: (202) 797-2354
Email: dclaw@radix.net